### WARD et al. v. BOND et al. (No. 3152.)

Court of Civil Appeals of Texas. Amarillo. Oct. 31, 1928.

Rob't A. Sowder, of Lubbock, for appellants.

Schenck & Triplett, of Lubbock, for appellees.

HALL, C. J. The appellant Ward, joined by numerous other resident property taxpayers and voters of Cochran county, filed this suit against J. R. Bond, county judge of said county, F. F. Rowland, Jim Robinson, P. L. Thacker, and E. V. Riley, county commissioners, alleging that Cochran county is duly organized with a population of about 1,200 people; that in 1926 the commissioners' court divided the county into four commissioners' precincts. The petition sets out the boundaries of said commissioners' precincts as described in the order of the commissioners' court, the field notes of said precincts showing that the county was so divided that the lines of each of the several precincts converged in the county courthouse in the town of Morton, the county seat.

It appears from the maps used in oral argument that Morton is about two miles west of the center of the northeast one-fourth of the county. According to the division then made, commissioners' precinct No. 1, in area, is about one-eighth of the county and irregular in shape, but lying mainly in the northeastern corner of the county. Precinct No. 2 lies south of precinct No. 1 along the east side of the county with an L extension, including a small portion of the south part of the town plot of Morton, and in area is about one-sixth of the county. Precinct No. 4 lies principally in the northwest corner of the county, and in area is about one-fifth of the county. Precinct No. 3 comprises all of the territory lying in the southwestern part of the county, and includes a portion of the southeast one-fourth of the county, with an irregular extension which fixes its northeast corner at the courthouse in Morton, where it corners with each of the other precincts. The Santa Fé Railroad enters the county at about the center of its east line, and runs west through the county to the state line. According to the maps before us, the town of Whiteface, situated on the railroad, is in precinct No. 2 on the east line of the county. The town of Lehman, also on the railroad, and

described as a shipping point for cattle, is near the center of the county in precinct No. 3.

About two years before the trial of this case, the town of Bledsoe was established on the railway at the eastern border of the county; the last two towns lying within precinct No. 3, as originally established.

The plaintiffs allege that each of the commissioners' precincts had a voting place in the town of Morton; that precinct No. 2 had another voting place at the town of Whiteface; that precinct 3 had voting places at the towns of Bledsoe and Lehman, and that precinct 4 had a voting box at the Neely-Ward school, about seven miles from the town of Morton; that at the general election in November, 1926, 80 votes were polled in commissioners' precinct No. 1, 42 votes in precinct No. 2, 111 votes in precinct No. 3, and 120 votes in precinct No. 4; that in the Democratic primary of 1928, 91 votes were polled in precinct No. 1, 48 votes in precinct No. 2, 121 votes in precinct No. 3, and 134 votes in precinct No. 4; that the average population of such commissioners' precincts is about 2½ persons to each vote polled at such elections; that precinct No. 1 contained 28½ miles of improved public roads, and that the remainder of the county had approximately 85 miles of such roads; that the northeastern part of the county is a well-settled farming community; that the south 12 miles of the county does not contain exceeding five farms, and the aggregate of said farms does not exceed 800 acres; that there are not exceeding 40 persons residing in the south 12 miles of the county, and that nine-tenths of the land therein is owned by not exceeding 15 owners, practically all of whom are nonresidents of the county; that on the 18th day of August, 1928, the said commissioners' court passed an order purporting to redistrict said county into commissioners' precincts. Maps before us show that the county was divided into four precincts by two lines running north and south and east and west through said county, said lines intersecting two or three miles northwest of the townsite of Lehman. The line running north and south runs about one mile east of the geographical center of the county, and the line running east and west, which contains two small jogs, runs about 2½ or 3 miles north of and parallel with the railroad. As stated, the railroad practically divides the county north and south into two equal areas. The result of the last redistricting is to divide the county into four commissioners' precincts, with precinct No. 1 including the town of Morton and comprising nearly all of the northeast one-fourth of the county. Precinct No. 2 comprises all the territory lying in the southeast one-fourth of the county; precinct No. 3 comprises the territory in the southwest corner of the county; and No. 4, in the northwest corner.

The result of this division is to create four commissioners' precincts practically equal in area, with a small excess in favor of precincts 2 and 3. The plaintiff alleges that as redistricted precinct No. 1 will have 225 votes and a population of 600 with 60½ miles of improved public roads; that precinct No. 2 will have a voting strength of 44 and a population of 100; that precinct No. 3 will have a voting strength of 75 and a population of 185, and precinct No. 4, a voting strength of 50 and a population of 125; that if the precincts are permitted to stand, as designated by the last order of the commissioners' court, until the November election, a voting population of 169 will elect three commissioners, and a voting population of 600 will only elect one commissioner; that a majority of the residents of the county will be represented by only two commissioners, and will be deprived of their right to locally govern themselves, and that approximately two-fifths of the people, through three commissioners, will govern the whole county; that the 60 miles of road in precinct No. 1 will not be kept in a passable condition for the reason that it would be allowed only one-fourth of the road fund of the county, while each of the other precincts using a similar amount, with less than one-half of the road mileage, will use three-fourths of the road fund.

It is further alleged that the order dividing the county in commissioners' precincts abolished the town of Lehman as a voting place; that such town has a population of 25 people, with 16 other voters residing in the vicinity of said town, who have been accustomed to vote there; that said order makes the town of Whiteface, situated on the extreme eastern border of the county, the voting box for precinct No. 2 and that said voters who have heretofore voted at Lehman will have to travel an average of 12 miles to Whiteface, over insufficient roads, to exercise their right of suffrage; that all of precinct No. 2, except the settlements at Lehman and Whiteface, is made up of large ranches of 10,000 acres and upwards; that said precinct now has 21 miles of improved public roads, and needs no further roads, but will be entitled to one-fourth of the entire road fund of the county; that precinct No. 2, under the late order above mentioned, contains less than 20 miles of improved roads, and the same conditions exist with reference thereto as exist in precinct No. 2; that plaintiffs Harris, Taylor, Reed, Jones, and Smith are and have been residents of precinct No. 1, as heretofore and now exists; that plaintiffs Kenyon, Caldwell, and W. S. Jones, who have heretofore resided in precinct No. 4, will, if the redistricting order is sustained, become residents of precinct No. 1; that plaintiffs Ward and Morrow, who have heretofore resided in precinct No. 2, will also become residents of precinct No. 1; and plaintiffs O'Pry and Holt will be changed from precinct No. 3 to precinct No. 2, and will have to travel 13 miles in order

to vote at the Whiteface box, over insufficient roads, which will practically deprive them of their right to vote.

It is further alleged that the county judge and each of the four commissioners were candidates for re-election at the July primaries, and were all defeated for their several offices, except Commissioner Riley, whose opponent, plaintiff Kenyon, received a plurality of the votes cast in said precinct; that the change in the precinct lines and boundaries was fraudulently done in order that at the general election in November the said commissioners or persons controlled by them will have charge of the commissioners' court and the affairs of the county, and that by the proposed change in precinct lines, the candidate for commissioner, who defeated Commissioner Rowland, remains in precinct No. 1; that the plaintiff Ward, who received the Democratic nomination for the office of commissioner of precinct No. 2, is, by the said change, placed into precinct 1, where the plaintiff Kenyon also resides; that the purpose of said gerrymandering was to defeat the will of the majority of the voters in selecting said commissioners for precincts 1 and 4, and that such action is unreasonable, arbitrary, fraudulent, and void, and not for the convenience and well-being of the people of the county; that, except for the building of the town of Bledsoe in precinct 3, there has been no relative change in the population or voting strength of said county for more than two years, and there is no likelihood of such a material change; that all of the voters in said county voted at the last primary election; that there is, and has been for several years, a post office at Lehman, which is the largest shipping point in the county; that the defeated opponent of plaintiff Ward is left, by such redistricting, a resident of precinct No. 2; that he is a political supporter of the present commissioner from precinct No. 2 and of the county judge; that the said order of August 18th appointed election officers to preside at the general election, all of whom are the political supporters and henchmen of the defeated members of the commissioners' court and of Riley, a candidate in the run-off primary; that a nomination for office by the Democratic Party in said county is, in effect, an election; that it was the purpose of said defendants, acting in their official capacity, to deprive voters and citizens in precinct No. 1 of their elective franchise by permitting more than three-fifths of the voters of the whole county to vote only for one commissioner.

The prayer is for a temporary restraining order, prohibiting the commissioners' court from putting said order of August 18th into effect, and requiring them to recognize the boundary lines of the commissioners' precincts, as theretofore existing, and to maintain the voting places as theretofore established, and that upon a final hearing the restraining order be made permanent and mandatory.

A temporary restraining order was granted on August 23, 1928, by Hon. Clark M. Mullican, judge of the Ninty-Ninth judicial district, upon a showing that Hon. Homer L. Pharr, judge of the Seventy-Seventh judicial district, was inaccessible at that time.

The defendants answered by numerous exceptions and a general denial, and specially alleged that the commissioners' precincts, as they existed in Cochran county prior to the order of August 18, 1928, were impractical, inconvenient, and did not give a fair representation of the citizens, taxpayers, and voters of the county; that under the original redistricting order, the county judge, living in an area in the northeastern part of the county, comprising approximately one-twelfth of the area of the county, and two commissioners, also living in the northeastern part of the county, representing about one-tenth of the area of the county and owning land therein, at various times passed orders providing for the building and grading of roads in the northeastern part of the county, and did build and grade said roads at a cost of many thousands of dollars, for the convenience of the people living in that area, resulting in an unjust discrimination against all taxpayers, citizens, and voters living elsewhere in the county; that they have refused to provide any roads or maintain the same in the southern half of the county, but have expended large sums of money in constructing roads in the north half of the county and principally in the northeast one-sixth of the county; that Bledsoe is about four times as large in population and improvements as the town of Morton, and in going to Lubbock, which is their principal market, the citizens of Bledsoe must travel an insufficient road running parallel with the line of railway; that said road is filled with mesquite bushes, stumps, and chug holes, and is practically impassable for automobiles during a greater portion of the year; that the grand jury impaneled at the last term of the district court in Cochran county investigated the financial and political affairs of the county, and in their report strongly condemned the attitude of the commissioners' court of Cochran county in favoring the northern portion of the county as against the southern half, and recommended that the commissioners' precincts should be changed and the lines resurveyed so as to conform to the lines and boundaries described in plaintiffs' original petition as the new precinct lines of the county; that according to the new division of the county, each precinct represents practically one-fourth of the county and contains property of practically the same taxable value and the same number of individual voters in each precinct; that if the restraining order is not immediately dissolved, it will result in perpetuating the present commissioners' court.

in power, who are interested solely in the upbuilding of the northern portion of the county; that the southern portion will never be able to obtain its pro rata part of county funds and improvements, and its settlement and progress will be retarded and prohibited; that many of the plaintiffs in the petition for injunction in this case were members of the grand jury, and recommended the redistricting of the county substantially as done in the order of the commissioners' court, and are now estopped from complaining of said order; that as originally formed, precinct 1 comprised about 105 square miles, precinct 2 about 182 square miles, precinct 3 about 318 square miles, and precinct 4, 182 square miles.

The plaintiffs replied by a supplemental petition, charging a fraudulent purpose and political trickery in the passage of the redistricting order of August 18, 1928, alleging: That under the new order Kenyon would be placed in precinct No. 1, thus permitting Commissioner Riley to hold over and defeat the will of the people, and Ward would become a resident of precinct No. 1 instead of precinct No. 2, and because of the fact that he had defeated one Woodley as candidate for commissioner of the original precinct, he could not be elected in November. That defendant Robinson, who was defeated for sheriff at the primary election, would, by said redistricting order, be permitted to hold over for another term, and that the general purpose in passing said order by the defendants was to perpetuate themselves in office and in power in said county.

The trial was before the court without a jury, and resulted in a judgment approving the redistricting order of August 18, 1928, which divided the county into practically four equal districts, but decreed that the portion of said order which abolished the town of Lehman as a voting place should be annulled, and that Lehman should be restored as a voting box.

The court filed findings of fact and conclusions of law in substance as follows: That the order of August 18, 1928, would divide Cochran county into four equal areas, regular and symmetrical in shape and form, and that such precincts, as formed, would contain property of approximately equal taxable values, and, as thus formed, would be most convenient to the people of the county, the taxpayers and voters thereof; that the precincts as so formed were to the financial and political interests of the people situated in the respective precincts, and would be to the best interests of the county as a whole; that the order was fairly passed, and the court was not actuated by any fraudulent motive or intent; that in passing said order, the court did not abuse its discretion, and that the precincts, as constituted thereby, should be maintained and perpetuated.

The court filed supplemental findings of fact in substance as follows: That the town of Bledsoe has 85 voters, Whiteface has 20 voters, and Lehman 20 voters; that prior to the order of August 18, 1928, precinct No. 1 contained 86 voters, precinct No. 2, 128 voters and precinct No. 4, 127 voters; that under the new order, precinct No. 1 will contain 260 voters, precinct No. 2, 48 voters, precinct No. 3, 65 voters, and precinct No. 4, 104 voters; that the land in precinct No. 1 is about 95 per cent. tillable, in precincts Nos. 2 and 3 the land is about 75 per cent. tillable, and in precinct No. 4 it is about 80 per cent. tillable; that the Santa Fé Railroad runs through precincts 2 and 3 as they will exist under the order of August 18th; that the dwellings and store buildings in Morton and Bledsoe are all of the cottage and frame type; that there are more store buildings in Bledsoe than in Morton; that the population south of the south lines of precincts 1 and 4, as designed by the order of August 18th, is about 700 people with about 1,200 people living north of said lines.

It appears that at the time the commissioners redistricted the county into commissioners' precincts, it was also divided into justice and voting precincts, giving to precinct No. 2 only one voting place at Whiteface. The appellant does not attack the action of the court with reference to justice and voting precincts, except that Lehman was discontinued as a voting place in precinct No. 2.

The order, in so far as it divides the county into commissioners' precincts, is attacked upon two grounds, because it is not for the convenience of the people, and that the commissioners were actuated by fraud. Appellant insists that it is a significant fact that this order was passed after the first primary and prior to the second, when it appeared that the county judge and the four original commissioners were all defeated. It does not appear why this particular time was selected for changing the precincts, but the trial judge saw the witnesses, heard them testify, and was no doubt familiar with the conditions existing in that county, and we are bound by his finding that there was no fraud. Bradford v. Moseley (Tex. Com. App.) 223 S. W. 171.

If the commissioners' court to be elected at the coming November election should be guilty of any fraud or misconduct with reference to the matters complained of, the appellants will have their remedy. Cannon v. McComb (Tex. Civ. App.) 268 S. W. 999. A mere allegation that, as a result of the court's action, it is possible for precinct No. 1 not to get its share of the road money or its full share of any other public fund, is not sufficient to invoke the equity powers of the court. The presumption obtains that the incoming commissioners and county judge will perform the duties imposed upon them by the Constitution and the laws in an impartial and legal manner.

The commissioners' court of a county,

by Constitution, article 5, § 18, and R. S. article 2339, is empowered to divide the county into four commissioners' precincts, and it is directed that such division shall be made from time to time for the convenience of the people. The precincts under the new division are certainly more convenient for the people residing in each precinct than has heretofore existed, and no objection can be urged upon that ground. In the case of Dubose v. Woods (Tex. Civ. App.) 162 S. W. 3, it affirmatively appears that the new districts, as created, were largely disproportionate as to acreage and population, and several large towns in the county, which had been voting places for 30 years, were discontinued as such. In the instant case, the districts as created by the order of August 18th are nearly the same in area, and the testimony shows, and the court so found, that they were about equal in the matter of property values. The fact that the northern half of the county may contain several hundred more inhabitants than the lower half is not such a serious consideration as would justify this court in reversing the judgment. It may be inferred that since the construction of the railway through the county, and which runs from east to west near the northern boundaries of the two southern precincts, within a reasonable time precincts 2 and 3 will increase in population until even this objection to the order will disappear. The evidence shows that the town of Bledsoe, which was established about two years before the trial, has twice as many buildings and residences as the town of Morton. We do not construe the word "convenience," as used in the Constitution, as necessarily applying to the convenience of all the people of the county, but rather should be limited to the convenience of the residents of each district, as created.

It may be possible that hereafter the commissioners of precincts 2, 3, and 4 will combine against precinct No. 1, in the meetings of the court in apportioning the road fund and other county interests, but we cannot presume that they will use this combined power unfairly, unjustly, and oppressively. As stated, the presumption is the other way. That a commissioners' court has authority to change precinct lines and redistrict the county, even in part, although in doing so a justice of the peace is deprived of his office, is settled in the case of State v. Rigsby, 17 Tex. Civ. App. 171, 43 S. W. 271. The fact that in the instant case certain candidates and commissioners who formerly lived in precincts 1, 2, and 3 have now become residents of other precincts, and that the change has resulted in putting two commissioners, who formerly lived in other precincts, in the same precinct, is no ground for annulling the order. If, as held in the Rigsby Case, a duly elected officer has no such vested right to his office as will enable him to prevent re-districting the county, then surely a candidate, though a party nominee, has no such right.

The facts before us do not bring this case within the rules announced in Dubose v. Woods, supra, and Williams v. Woods (Tex. Civ. App.) 162 S. W. 1031, in which latter case the gerrymandering was condemned because the new division lines practically deprived some voters of their right of franchise.

We find no reversible error, and the judgment is affirmed.